Dockets.Justia.com

1 GLENN D. POMERANTZ (SBN 112503)
Glenn.Pomerantz@mto.com
2 BART H. WILLIAMS (SBN 134009)
Bart.Williams@mto.com
3 KELLY M. KLAUS (SBN 161091)
Kelly.Klaus@mto.com
4 MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth Floor
5 Los Angeles, CA 90071-1560
Tel: (213) 683-9100; Fax: (213) 687-3702
6
7 ROBERT H. ROTSTEIN (SBN 72452)
rxr@msk.com
8 ERIC J. GERMAN (SBN 224557)
ejg@msk.com
9 BETSY A. ZEDEK (SBN 241653)
baz@msk.com
10 MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
11 Los Angeles, California 90064-1683
Tel: (310) 312-2000; Fax: (310) 312-3100
12 GREGORY P. GOECKNER (SBN 103693)
gregory_goeckner@mpaa.org
13 DANIEL E. ROBBINS (SBN 156934)
dan_robbins@mpaa.org
14 15301 Ventura Boulevard, Building E
Sherman Oaks, California 91403-3102
15 Tel: (818) 995-6600; Fax: (818) 285-4403

16 Attorneys for Plaintiffs

17

18 UNITED STATES DISTRICT COURT

19 CENTRAL DISTRICT OF CALIFORNIA

20 WESTERN DIVISION

21 **CV08-06412** SJO AJWx

UNIVERSAL CITY STUDIOS | CASE NO.
22 PRODUCTIONS LLLP, UNIVERSAL
CITY STUDIOS LLLP, PARAMOUNT | **PUBLIC REDACTED VERSION**
23 PICTURES CORPORATION, | **NOTICE OF APPLICATION AND**
TWENTIETH CENTURY FOX FILM | ***EX PARTE* APPLICATION OF**
24 CORPORATION, SONY PICTURES | **PLAINTIFFS FOR TEMPORARY**
TELEVISION INC., COLUMBIA | **RESTRAINING ORDER AND**
25 PICTURES INDUSTRIES, INC., SONY | **ORDER TO SHOW CAUSE RE:**
PICTURES ENTERTAINMENT INC., | **PRELIMINARY INJUNCTION;**
26 DISNEY ENTERPRISES, INC., WALT | **MEMORANDUM OF POINTS AND**
DISNEY PICTURES and WARNER | **AUTHORITIES IN SUPPORT**
27 BROS. ENTERTAINMENT INC., | **THEREOF**

28                Plaintiffs, | Time:   N/A

NOTICE & APPL. OF PLAINTIFFS FOR
TRO AND ORDER TO SHOW CAUSE

2009 SEP 30 AM 10: 26
CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIF.
LOS ANGELES
FILED
BY

vs.

REALNETWORKS, INC.; and
REALNETWORKS HOME
ENTERTAINMENT, INC.,

Defendants.

Date:     N/A

# *EX PARTE* APPLICATION

Plaintiffs Paramount Pictures Corporation, Twentieth Century Fox Film Corporation, Universal City Studios Productions LLLP, Warner Bros. Entertainment Inc., Disney Enterprises, Inc., Sony Pictures Television Inc. and Columbia Pictures Industries, Inc. (collectively, "Plaintiffs") hereby apply *ex parte* to this Court for:

1. A temporary restraining order ("TRO") restraining and enjoining defendants RealNetworks, Inc. and RealNetworks Home Entertainment, Inc. ("Real" or "Defendants") and all of their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation or privity with any of them, from selling, offering, marketing or otherwise trafficking in the software product known as RealDVD, or any product with substantially similar functionality.

2. An order to show cause why a preliminary injunction, against the same persons and restraining the same activities, should not issue.

Good cause exists for the foregoing Order. As set forth in the accompanying Memorandum of Points and Authorities and supporting papers filed herewith, Defendants are violating and will continue to violate 17 U.S.C. § 1201, *et seq.*, by manufacturing, offering to the public, providing, or otherwise trafficking in a software product entitled "RealDVD." RealDVD (a) is primarily designed and produced, (b) is marketed by Defendants and (c) has no commercially significant use other than to circumvent the Content Scramble System technology that controls access to and copying of Plaintiffs' copyrighted works when those works are encrypted onto DVDs. As further set forth in Plaintiffs' Memorandum of Points and Authorities and supporting papers, Defendants' conduct is causing and unless restrained will continue to cause immediate and irreparable harm to Plaintiffs, including to Plaintiffs' DVD rental and sale markets, and to many other young and developing markets for the distribution of Plaintiffs' works in digital format. Further, Real will suffer no cognizable hardship in waiting for the very brief period

1    This Application and all accompanying papers have been served by e-mail
2    and fax on counsel for the Defendants.

3    DATED: September 30, 2008            MUNGER, TOLLES & OLSON LLP

4                                         MITCHELL SILBERBERG & KNUPP
                                          LLP
5
                                          GREGORY P. GOECKNER
6                                         DANIEL E. ROBBINS

7
                                          By: _____
8                                             GLENN D. POMERANTZ

9                                         Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ........................................................................... 1

II.  BACKGROUND ............................................................................ 6

     A.   The Development And Operation Of CSS To Protect Digital
          Content From Copying ........................................................... 6

     B.   The DMCA And Its Protection Of CSS ..................................... 8

     C.   Real's CSS-Circumvention Product:  RealDVD ......................... 9

     D.   Plaintiffs' Complaint And Efforts To Obviate The Need For
          This TRO Motion ................................................................. 10

III. ARGUMENT ............................................................................... 10

     A.   A Temporary Restraining Order Is Appropriate To Halt A
          DMCA Violation .................................................................. 10

     B.   Plaintiffs Are Likely To Succeed On Their DMCA Claim ......... 11

          1.   CSS Is A "Technological Measure" That Both
               "Effectively Controls Access" To Copyrighted Works
               And "Effectively Protects A Right Of A Copyright
               Owner" ....................................................................... 12

          2.   RealDVD Circumvents Both The Access-Control And
               Copy-Control Technological Measures Of CSS ............... 12

               a.   RealDVD Circumvents CSS's Access Controls ........... 13

               b.   RealDVD Circumvents CSS's Copy Controls .............. 14

               c.   RealDVD Does Not Have To "Break" CSS
                    Encryption In Order To Be A Circumvention
                    Product ..................................................................... 15

          3.   RealDVD Circumvents CSS's Access Control Measures
               "Without The Authority Of The Copyright Owner" ......... 15

          4.   RealDVD's Design, Marketing And Use Violate Each Of
               The Anti-Trafficking Provisions Of Sections 1201(a)(2)
               and 1201(b)(1) ............................................................. 19

          5.   Real Has No Defense To Its Violation Of The DMCA ......... 19

     C.   Plaintiffs Will Suffer Irreparable Injury Absent An Injunction.......... 20

**TABLE OF CONTENTS**
(continued)

Page

1. RealDVD Will Irreparably Harm Plaintiffs' DVD Sales And Rental Market ................................................................. 21

2. RealDVD Will Irreparably Harm The Studios' Less Mature (And Developing) Markets ........................................... 22

IV. CONCLUSION ........................................................................... 25

- ii -

# TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*321 Studios v. Metro Goldwyn Mayer Studios, Inc.*,
307 F. Supp. 2d 1085 (N.D. Cal. 2004) ............................................................. passim

*Atlanta Attachment Co. v. Leggett & Platt, Inc.*,
2007 WL 5011980, at * 6-7 (N.D. Ga. Feb. 23, 2007) ...................................... 22

*Cook Inc. v. Boston Scientific Corp.*,
208 F. Supp. 2d 874 (N.D. Ill. 2002) ................................................................ 18

*Dep't Parks & Rec. of Calif. v. Bazaar Del Mundo, Inc.*,
448 F.3d 1118 (9th Cir. 2006) ........................................................................... 10

*Engquist v. Oregon Dep't of Agriculture*,
478 F.3d 985 (9th Cir. 2007) ............................................................................. 16

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
387 F.3d 522 (6th Cir. 2004) ............................................................................. 20

*LGS Architects, Inc. v. Concordia Homes of Nevada*,
434 F.3d 1150 (9th Cir. 2006) ........................................................................... 18

*Macrovision v. Sima Products Corp.*,
2006 WL 1063284 (S.D.N.Y. Apr. 20, 2006) ............................................. 11, 20

*MercExchange, L.L.C. v. eBay, Inc.*,
500 F. Supp. 2d 556 (E.D. Va. 2007) ............................................................... 22

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*,
518 F. Supp. 2d 1197 (C.D. Cal. 2007) ............................................................ 22

*Microsoft Corp. v. EEE Business Inc.*,
555 F. Supp. 2d 1051 (N.D. Cal. 2008) ............................................................ 15

*Paramount Pictures Corp. v. 321 Studios*,
2004 WL 402756 (S.D.N.Y. Mar. 3, 2004) ...................................................... 11

*RealNetworks, Inc. v. Streambox, Inc.*,
2000 WL 127311 (W.D. Wash. Jan. 18, 2000) ................................... 4, 5, 11, 19

*Roe v. Anderson*,
134 F.3d 1400 (9th Cir. 1998) ........................................................................... 10

*S.O.S. Inc. v. Payday, Inc.*,
886 F.2d 1081 (9th Cir. 1989) ..................................................................... 17, 18

*Sony Computer Entertainment America, Inc. v. Gamemasters*,
87 F. Supp. 2d 976 (N.D. Cal. 1999) ................................................................ 11

*Textile Prods., Inc. v. Mead Corp.*,
134 F.3d 1481 (Fed. Cir. 1998) ......................................................................... 18

*Ticketmaster L.L.C. v. RMG Technologies, Inc.*,
507 F. Supp. 2d 1096 (C.D. Cal. 2007) ............................................................ 11

*Tivo, Inc. v. Echostar Communications Corp.*,
446 F. Supp. 2d 664 (E.D. Tex. 2006), rev'd on other grounds, 516 F.3d 1290 (Fed.
Cir. 2008) ........................................................................................................... 22

NOTICE & APPL. OF PLAINTIFFS FOR
TRO AND ORDER TO SHOW CAUSE

# TABLE OF AUTHORITIES
## (continued)

Page

*U.S. Cellular Inv. Co. of Los Angeles, Inc. v. AirTouch Cellular,*
  2000 WL 349002 (C.D. Cal. Mar. 27, 2000) ............................................. 10

*United States v. Elcom Ltd.,*
  203 F. Supp. 2d. 1111 (N.D. Cal. 2002) ................................................. 20

*Universal City Studios, Inc. v. Corley,*
  273 F.3d 429 (2d Cir. 2001) ......................................................... passim

*Universal City Studios, Inc. v. Reimerdes,*
  111 F. Supp. 2d 294 (S.D.N.Y. 2000) .................................................... 3

*Universal City Studios, Inc. v. Reimerdes,*
  82 F. Supp. 2d 211 (S.D.N.Y. 2000) ................................................. passim

*Warrior Sports, Inc. v. STX, LLC,*
  2008 WL 783768 at * 12 (E.D. Mich. Mar. 19, 2008) ..................................... 22

*Xoxide, Inc. v. Ford Motor Co.,*
  *448 F. Supp. 2d 1188 (C.D.Cal. 2006)* ................................................. 6

### STATE CASES

*Abelson v. National Union Fire Ins. Co.*
  28 Cal. App. 4th 776 (1994) ........................................................... 16

*DVD Copy Control Ass'n v. Bunner,*
  31 Cal. 4th 864 (2003) ................................................................. 7

*DVD Copy Control Association, Inc. v. Kaleidescape, Inc.*
  _____ ............................................................... 16

### STATUTES AND RULES

17 U.S.C. § 1201 ................................................................... 1, 2
17 U.S.C. § 1201(a)(1) ............................................................... 12
17 U.S.C. § 1201(a)(2) ........................................................... passim
17 U.S.C. § 1201(a)(3)(A) ...................................................... 3, 13, 15
17 U.S.C. § 1201(b) .................................................................. 15
17 U.S.C. § 1201(b)(1) .......................................................... passim
17 U.S.C. § 1201 (b)(2)(A) ..................................................... 3, 13, 15

NOTICE & APPL. OF PLAINTIFFS FOR
TRO AND ORDER TO SHOW CAUSE

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Anyone who has ever watched a popular movie on a DVD knows from the opening frames that copying the content on the DVD is strictly prohibited. Starting today, Defendants RealNetworks, Inc. and RealNetworks Home Entertainment, Inc. ("Real") are distributing a software product called "RealDVD" that does exactly that. RealDVD makes permanent, perfect, playable copies on computer hard drives. To accomplish this, RealDVD bypasses the longstanding technological measures that content owners have employed for over a decade to control access to and prevent copying of DVD content. The Plaintiff studios, which have spent billions of dollars to make, market and distribute the motion picture content that RealDVD exploits, have not given Real or anyone else permission to do this. RealDVD is an unlawful circumvention product under 17 U.S.C. § 1201, and Plaintiffs are entitled to a temporary restraining order ("TRO") to restrain its distribution, and an order to show cause setting a preliminary injunction motion on an expedited schedule. Plaintiffs asked Real to delay launching RealDVD by a few weeks to allow for an orderly preliminary injunction briefing and hearing. Declaration of Glenn D. Pomerantz ("Pomerantz Decl.") Ex. A. Real refused, thus forcing Plaintiffs to file this motion.

The relative hardships here are not even close. If not enjoined, Real will vigorously promote RealDVD to the more than 30 million consumers who currently use Real's products and countless others Real can access through an aggressive online marketing campaign. Absent an immediate injunction, large quantities of RealDVD are likely to be sold online – it is offered for just $29.99 – and once distributed, those copies can be used to construct large electronic jukeboxes of free, unrecoverable copies of Plaintiffs' content. These libraries can be assembled from DVDs rented at a fraction of the purchase price or simply borrowed for free. The upshot is potentially devastating harm, even in the very short term:  huge quantities

of permanent, playable copies of plaintiffs' DVD content made without any payment to copyright owners, and a potentially fatal blow to the efforts of the studios and their partners (including iTunes, Amazon.com and others) to offer legitimate ways to provide digital copies of DVD content to consumers. Moreover, the irreparable harm that RealDVD causes extends well beyond difficult-to-calculate damages from widespread illegal and undetectable copying. Real also threatens, even in the very short term, to radically change consumer perceptions about lawful conduct. Real is not a renegade teenager plying a computer hack from the dark corners of the Internet. Real is a major U.S. corporation that is relentlessly promoting RealDVD as "legal" and "100% legit." Pomerantz Decl. Exs. H & I. Real thus threatens to instill in consumers the false notion (not easily reversed) that conduct that always has been understood to be illegal – copying movies from DVDs on which they are secured and distributed – is perfectly lawful.

The hardship to Real from deferring its launch for less than a month, until a preliminary injunction motion can be heard, pales in comparison. Real is just starting to distribute RealDVD today. Real is not in danger of missing the holiday gift-buying window or having to recall product from purchasers or retail distributors. Real distributes RealDVD exclusively from its online site. It can comply with a TRO by flipping a computer switch, and it will suffer no legally cognizable harm while giving the Court a chance to rule. Real claims that any delay could cause Real to lose "first mover advantage" in a market for DVD copiers. Pomerantz Decl. Ex. C at 2. But Real has no right to be a "first mover" in an illegitimate market. Plaintiffs are entitled to immediate relief because:

***Plaintiffs Are Likely To Succeed On The Merits***: Federal law gives Plaintiffs an express right – under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201[1] – to immediate injunctive relief to stop Real's

---

[1] Except as otherwise stated all statutory citations are to 17 U.S.C.

NOTICE & APPL. OF PLAINTIFFS FOR TRO AND ORDER TO SHOW CAUSE

1   unauthorized distribution of software that circumvents the technologies that protect

2   content on DVD.  Real is not the first entity that has tried to profit by marketing

3   software designed to circumvent these technologies.  Real follows in a long line of

4   others, whose activities the federal courts have consistently enjoined in an unbroken

5   string of decisions holding that the DMCA prohibits the trafficking in products that

6   "circumvent" effective "technological measures" that safeguard against access to

7   and copying of protected DVD content.  *See, e.g.*, *Universal City Studios, Inc. v.*

8   *Reimerdes*, 82 F. Supp. 2d 211 (S.D.N.Y. 2000) and 111 F. Supp. 2d 294 (S.D.N.Y.

9   2000), *aff'd Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001).

10  The well-settled law from these prior cases establishes Real's liability.

11      First, the DVDs that RealDVD copies are protected by applicable

12  "technological measures."  Access to, and copying of, content on DVDs is

13  protected through a system known as the DVD Content Scramble System ("CSS").

14  Plaintiffs and other copyright owners have used CSS to prevent playable copies of

15  DVD content from being made since the initial release of DVDs over a decade ago.

16  Courts have held repeatedly that, under the DMCA's plain language, CSS is a

17  "technological measure" that effectively controls access to and copying of works

18  protected under the copyright laws, and that federal law bars the manufacture and

19  distribution of products designed and marketed to circumvent CSS.  §§ 1201(a)(2),

20  (b)(1).  *See, e.g.*, *321 Studios v. Metro Goldwyn Mayer Studios, Inc.*, 307 F. Supp.

21  2d 1085, 1096 (N.D. Cal. 2004); *Reimerdes*, 111 F. Supp. 2d at 318.

22      Second, RealDVD "circumvents" CSS because it "avoid[s]," "bypass[es]"

23  and "impair[s]" CSS's protections and controls without any authority from the

24  copyright holders whose works CSS protects.  *See* §§ 1201(a)(3)(A), (b)(2)(A); *321*

25  *Studios*, 307 F. Supp. 2d at 1096.

26      Real admits that what RealDVD does "has been done illegally for awhile"

27  with other products.  Pomerantz Decl. Ex. K.  But Real is telling consumers that

28  RealDVD is "legal" and "100% legit" because Real obtained a license for CSS.  In

3

fact, what Real obtained was a CSS license that authorized Real to *play* DVDs, not to *copy* them. Real asserts that the license shields it from liability based on a ruling (now on appeal) by a state trial court denying a contract-breach claim brought by the CSS licensing organization against a different CSS licensee. *Id*. Ex. C at 2. That court did not decide any issue of *DMCA* liability; the court made clear it was not deciding any issue of federal law at all. Moreover, the court never said that a CSS license confers affirmative authorization from the Plaintiff copyright owners to circumvent the CSS access and copy controls. And the CSS license says no such thing. What the CSS license does say is that its objectives include ███ ███

████████████████████████████████████████ Pomerantz Decl.

Ex. G (emphasis added). Real's CSS license is no defense to its DMCA liability.

Real also has asserted that RealDVD is justified because it "allows the holder of an authorized DVD to make a backup copy for personal use" but does not allow downstream copying because RealDVD adds its own, Real-specific, layer of encryption on copied content. *Id*. Ex. C at 2. Real adds its unique encryption layer *not* to protect Plaintiffs' rights (which Real is violating) but to ensure that its users will be locked in to Real's technology when they want to play their copied content. And any purported justification for an end-user's copying is legally irrelevant to Real's DMCA liability. That is clear from the case law. *See Corley*, 273 F.3d at 443. Real knows this is the law because *Real argued just this point* in obtaining a TRO and preliminary injunction in Real's own claim under the DMCA:

> [End-users] do not have the right to circumvent access and copy protections to copy content that copyright holders have made clear they do not want copied. That is what Congress specifically outlawed in enacting the DMCA. That is all that the [defendant's] product does and that is all that is at issue on this motion.

Pomerantz Decl. Ex. N at 5 (Real's Reply Brief in Support of Motion for Preliminary Injunction, Jan. 6, 2000, in *RealNetworks, Inc. v. Streambox, Inc.*, No. C-99-2070-P, W.D. Wash.). Real in that case read the DMCA law correctly, and

1 the Court granted Real a TRO and a preliminary injunction. *See RealNetworks, Inc.*
2 *v. Streambox, Inc.*, 2000 WL 127311 (W.D. Wash. Jan. 18, 2000). That remains
3 the correct reading of the law, and Plaintiffs are entitled to a TRO on this motion.

4     ***Plaintiffs Will Be Irreparably Harmed Absent An Injunction***. Real's
5 violation of the DMCA creates a presumption of irreparable harm. *See, e.g.*,
6 *Reimerdes*, 82 F. Supp. 2d at 215. Even without the presumption, the harm to
7 Plaintiffs is manifest. Starting today, consumers can make permanent copies of
8 movies they rent for $3.25 or borrow at no cost, all by paying a mere $29.99 to
9 Real. This threatens a fundamental change in consumer behavior. Why respect the
10 admonitions against copying DVDs when Real – a presumably reputable
11 manufacturer – says it is "100% legit" with RealDVD? Why pay $18.50 to
12 purchase just one DVD if one can simply use a $29.99 product to build a library of
13 perfect and permanent copies from DVDs rented or simply borrowed from friends
14 for free? Real's response to this threat is a wink-and-a-nod statement from its CEO
15 – an invitation to copy DVDs illegally that is disguised as an admonishment: "If
16 you want to steal, we remind you what the rules are and we discourage you from
17 doing it, *but we're not your nanny*." Pomerantz Decl. Ex. J (emphasis added).

18     Real's assault on the home DVD business is palpable, but the harm hardly
19 stops there. RealDVD also poses an immediate threat to Plaintiffs' significant
20 alternative means of delivering their content. Plaintiffs currently offer their content
21 through video-on-demand channels, internet downloads (through Amazon.com,
22 iTunes, etc.), "digital copy" DVDs (premium priced DVDs that come with a digital
23 copy that can be transferred to a computer, just as with RealDVD) and other means.
24 Plaintiffs are actively pursuing (and investing in) yet other digital distribution
25 channels. RealDVD threatens to undermine all of these present and potential
26 channels, causing immediate and massive economic injury to Plaintiffs and their
27 business partners. Real claims more than thirty million unique viewers of its
28 websites, Pomerantz Decl. Ex. O, and its RealPlayer product resides on millions

NOTICE & APPL. OF PLAINTIFFS FOR
TRO AND ORDER TO SHOW CAUSE

more. Real thus has the capability, through its other Internet-connected products, to "blast" its millions of users with e-mail messages to market RealDVD. Real's access to a large installed base of users, combined with its false assurances that RealDVD is "legal," creates a recipe for early and immediate adoption of RealDVD by millions of consumers whose perception about the legality of copying DVD's may be forever changed. Money damages cannot begin to compensate for such fundamental harm.

For these reasons, and as further explained below, the Court should issue a TRO to enjoin Real's distribution and issue an order to show cause why a preliminary injunction should not issue.[2]

## II.    BACKGROUND

### A.    The Development And Operation Of CSS To Protect Digital Content From Copying

The CSS access- and copy-control technology has been indispensable to the widespread dissemination of copyrighted motion picture content to consumers on DVD. While the digital revolution opened up vast new possibilities for distributing content, it also posed unprecedented risks of copying and worldwide distribution by pirates. *See Corley*, 273 F.3d at 436. CSS provided the means for copyright

---

[2] At 9:30 p.m. last night, Real's counsel sent a letter stating that Real intends to oppose this application. *See* Pomerantz Decl. Ex. E. Real's letter goes on to assert that venue over Plaintiffs' complaint in the Central District of California is improper, purportedly because Real's CSS license "provides for venue solely in the courts in Santa Clara County when addressing claims with the DVD CCA [the organization that licenses CSS technology]." *Id.* at 2. Real claims that it intends to file a declaratory judgment action in the Northern District of California, seeking a declaration that it is not in breach of its CSS license.

Real's venue argument is meritless. First, the CSS license says nothing about venue over a DMCA claim, which is Plaintiffs' first cause of action and the basis for this motion. Venue over the DMCA claim is clearly proper in this District. Second, Plaintiffs' complaint also includes a third-party beneficiary claim against Real for breach of the CSS license. Real's CSS license expressly grants Plaintiffs the right to bring a third-party beneficiary claim, and it expressly provides that venue is proper in the federal or state courts in any of Los Angeles, Santa Clara or San Francisco Counties, at Plaintiffs' election. *Id.* Ex. F at 25 (CSS License § 9.5(e)). Real's threatened declaratory judgment claim is plainly anticipatory of Plaintiffs' complaint and on that basis is subject to dismissal. *See Xoxide, Inc. v. Ford Motor Co.*, 448 F. Supp. 2d 1188, 1192-93 (C.D.Cal. 2006).

NOTICE & APPL. OF PLAINTIFFS FOR
TRO AND ORDER TO SHOW CAUSE

owners to release digital content with technological safeguards against mass theft. As courts have recognized, no motion picture studio would "have agreed to release movies on DVD's" without CSS's access and copy controls. *DVD Copy Control Ass'n v. Bunner*, 31 Cal. 4th 864, 870 (2003). *See also Corley*, 273 F.3d at 436.

CSS was developed through joint efforts of the motion picture, consumer electronics, and computer software and hardware industries. As pertinent here, CSS restricts access to and copying from DVDs in a number of important ways. CSS protects a DVD with many layers of protection – a system of locks upon locks – all designed to prevent copying.

First, CSS encrypts content on DVDs. Once content is encrypted, individual images of the movie or TV show are scrambled, and will not play unless and until they are decrypted. Declaration of Alan Bell ("Bell Decl.") ¶ 13b; *Corley*, 273 F.3d at 437-38.

Second, CSS controls access to the content on the DVD. Among other things, CSS requires that a software player "authenticate" itself to the DVD "drive," which is the device that reads the physical DVD.[3] "Authentication" involves the exchange of confidential CSS computer code between the player and the drive, so that the drive verifies the player is an authorized device. If the drive does not authenticate the player, then the drive will remain "locked": it will not spin the DVD disc, and it will not read or otherwise permit access to any of the data contained on that DVD. Bell Decl. ¶ 13a; Declaration of John P. J. Kelly ("Kelly Decl.") ¶ 12.

Third, CSS controls access to the mechanisms that are necessary to decrypt the content on a DVD and make it playable. These mechanisms are "decryption keys," and they are burned onto the DVD in a special region called the "lead-in"

---

[3] A DVD "player" (hardware or software) is the product that plays the content on the DVD for the end-user. A DVD "drive" is the product that reads the data from the physical DVD. The authentication processes discussed herein are not relevant to standalone hardware DVD players.

NOTICE & APPL. OF PLAINTIFFS FOR
TRO AND ORDER TO SHOW CAUSE

area. These decryption keys are themselves protected by two layers of security:
(1) only a properly authenticated player with the secure unlocking codes discussed
above can access the lead-in area, and thus obtain the keys that are necessary to
decrypt the content, Bell Decl. ¶ 13c; *Reimerdes*, 111 F. Supp. 2d at 317-18; and
(2) the decryption keys are themselves encrypted. The license gives legitimate
players the decryption codes necessary to access the decryption keys for the DVD.

An essential purpose of this elaborate protection scheme is to prevent
*copying* of the content on DVDs. CSS "is an encryption-based system that requires
the use of appropriately configured hardware ... to decrypt, unscramble and play
back, *but not copy*, motion pictures on DVDs." *Reimerdes*, 111 F. Supp. 2d at 308
(emphasis added). *Corley*, 273 F.3d at 437-38.

CSS technology is licensed by the DVD Copy Control Association ("DVD
CCA"). Bell Decl. ¶ 10; *321 Studios*, 307 F. Supp. 2d at 1095. The DVD CCA's
members include representatives of the consumer electronics, computer hardware
and software, and motion picture industries (including Plaintiffs or their affiliates).
The DVD CCA provides licensed companies with access to the confidential
technical information and keys necessary for authentication and decryption. Bell
Decl. ¶ 13d; *see Corley*, 273 F.3d at 436-37; *Reimerdes*, 111 F. Supp. 2d at 310.

Not surprisingly, the DVD CCA License makes clear on its face that its
overriding objective is to prevent copying. Among other things, the License
provides that CSS was "developed ... to provide reasonable security for content on
DVD Discs and thereby, together with the terms and conditions of this Agreement,
to provide protection for such copyrighted content against unauthorized consumer
copying." Pomerantz Decl. Ex. F at 1 (Recital A). RealDVD thus enables what
CSS is designed to prevent.

## B.    The DMCA And Its Protection Of CSS

A technical system of access and copy controls is only as effective as the
legal protections that exist to enforce them. In 1998, Congress, alarmed by the ease

of digital piracy and the inadequacy of then-existing enforcement measures, enacted the DMCA. *Corley*, 273 F.3d at 435. The DMCA gives legal teeth to the protections of CSS and similar measures by providing for civil remedies, criminal sanctions and injunctive relief to restrain manufacturers of technologies that "circumvent" any "technological measure" that "effectively controls access to a work" or "protects a right of a copyright owner." §§ 1201(a)(2), 1201(b)(1).

Courts repeatedly have held that the CSS system is exactly the type of "technological measure" against unauthorized access and copying that the DMCA protects. *See Corley*, 273 F.3d at 435-36; *321 Studios*, 307 F. Supp. 2d at 1097-99; *Reimerdes*, 111 F. Supp. 2d at 347. And Courts repeatedly have enjoined distribution of products designed and marketed to circumvent CSS's protections. *See Reimerdes*, 111 F. Supp. 2d at 346-47; *321 Studios*, 307 F. Supp. 2d at 1105.

### C.    Real's CSS-Circumvention Product:  RealDVD

Real is a software development and internet media company based in Seattle. Although Real is famous for its "RealPlayer" product, Real had not, until August 2007, been a DVD CCA licensee. Upon becoming a DVD CCA licensee, Real received the confidential details of the CSS technology, including a set of authentication and decryption keys. Bell Decl. ¶ 13d; Pomerantz Decl. Ex. F. Real then used the technology and confidential information it obtained to build RealDVD, a CSS circumvention product that functions as a DVD *copier*. Real has announced it is distributing RealDVD starting today. Pomerantz Decl. Ex. C at 1.

RealDVD is simple to use. Once a DVD is inserted in a computer's disc drive, RealDVD copies the entirety of the disc's contents – the content (*e.g.*, the movie) as well as the decryption keys and other information in the lead-in area – onto either the computer's permanent hard-drive or a portable hard-drive. Kelly Decl. ¶¶ 25, 29. Thereafter, RealDVD can play the copy without limitation. *Id.* ¶ 25. Thus, a consumer can amass an electronic jukebox of movies, comprising exact copies of CSS-protected DVDs. Pomerantz Decl. Ex. I. Real allows the resulting

collection to be played on up to four additional computers, provided that each is supported by an additional copy of RealDVD (which may be bought for $19.99). *Id.* Ex. J. Because computers can be connected to televisions, the copied DVD content may be watched on any television. Kelly Decl. ¶ 6. As discussed below, RealDVD circumvents multiple of the CSS access- and copy-control protections.

### D. Plaintiffs' Complaint And Efforts To Obviate The Need For This TRO Motion

Real commenced a limited distribution of RealDVD at the beginning of September, but stopped within a few days. Since then, the parties have not resolved their disagreement concerning RealDVD. Real indicated last week that it planned to launch RealDVD on September 30. Plaintiffs then contacted Real by letter, requesting that it delay the launch by a few weeks so the Court could receive expedited preliminary injunction briefing. Pomerantz Decl. Ex. A. Real refused, claiming it needs to secure "first mover advantage." *Id.* Ex. C at 2. Plaintiffs also asked Real to confirm that, if an injunction issued, Real could disable all copies of RealDVD already distributed, thereby eliminating access to copies of DVD content created in the interim. Real refused even to respond to this inquiry. *Id.*

## III. ARGUMENT

### A. A Temporary Restraining Order Is Appropriate To Halt A DMCA Violation

The "standard for issuing a temporary restraining order is the same as the standard for issuing a preliminary injunction." *U.S. Cellular Inv. Co. of Los Angeles, Inc. v. AirTouch Cellular*, 2000 WL 349002, at *5 (C.D. Cal. Mar. 27, 2000). The moving party must show either (1) a likelihood of success on the merits and the possibility of irreparable injury or (2) the existence of serious questions going to the merits and the balance of hardships tipping in the movant's favor. *Roe v. Anderson*, 134 F.3d 1400, 1401-02 (9th Cir. 1998). "[T]hese two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Dep't Parks & Rec. of*

NOTICE & APPL. OF PLAINTIFFS FOR TRO AND ORDER TO SHOW CAUSE

*Calif. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1123 (9th Cir. 2006) (citations omitted). Plaintiffs satisfy both standards. Plaintiffs are overwhelmingly likely to succeed on their DMCA claim, and the unrestrained dissemination of RealDVD prior to an adjudication of the issues threatens to cause Plaintiffs irreparable harm. Plaintiffs' motion also raises serious questions and the balance of hardships weighs overwhelmingly for Plaintiffs. Injunctive relief is particularly appropriate in DMCA cases, where illegal circumvention threatens irremediable harm.[4]

## B. Plaintiffs Are Likely To Succeed On Their DMCA Claim

Plaintiffs' claim under the DMCA alleges that Real has violated two provisions of that statute. The first, Section 1201(a)(2), prohibits trafficking in "technology, product[s], service[s], device[s], component[s], or part[s] thereof" that are designed, marketed or useful to circumvent technological measures that control access to works protected by the copyright laws. The full section provides:

> No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that:
>
> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;
>
> (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or
>
> (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

§ 1201(a)(2).[5]

---

[4] Courts repeatedly have granted TROs and preliminary injunctions to enjoin the sale and distribution of products that violate the DMCA's anti-circumvention provisions. *See RealNetworks*, 2000 WL 127311 at *1; *Ticketmaster L.L.C. v. RMG Technologies, Inc.*, 507 F. Supp. 2d 1096 (C.D. Cal. 2007); *Macrovision v. Sima Products Corp.*, 2006 WL 1063284, at *3 (S.D.N.Y. Apr. 20, 2006); *Paramount Pictures Corp. v. 321 Studios*, 2004 WL 402756 (S.D.N.Y. Mar. 3, 2004); *Reimerdes*, 82 F. Supp. 2d 211; *Sony Computer Entertainment America, Inc. v. Gamemasters*, 87 F. Supp. 2d 976 (N.D. Cal. 1999).

[5] Though not directly relevant to this motion, the DMCA also prohibits the act of

NOTICE & APPL. OF PLAINTIFFS FOR
TRO AND ORDER TO SHOW CAUSE

Plaintiffs also allege that Real has violated Section 1201(b)(1), which includes analogous prohibitions on products designed, marketed or useful to circumvent technological measures that protect one or more of the exclusive rights of a copyright holder, including (as most directly relevant here) the right of reproduction, *i.e.*, copying, § 106. *See* § 1201(b)(1). As to both provisions – access-control and copy-control, respectively – a party is liable if it traffics in a circumvention product that meets one or more of the three enumerated tests (product primarily designed or marketed to circumvent or having only a limited commercially significant purpose for other uses). *See, e.g., 321 Studios*, 307 F. Supp. 2d at 1097-98. Plaintiffs can establish a likelihood of success by showing that Real likely violates *either* the access-control or copy-control provision. Under well-established DMCA case law, it is clear that Real violates *both* provisions.

### 1. CSS Is A "Technological Measure" That Both "Effectively Controls Access" To Copyrighted Works And "Effectively Protects A Right Of A Copyright Owner"

The case law is clear that CSS is a "technological measure" that "effectively controls access" to copyrighted works, § 1201(a)(2), and that "effectively protects a right of a copyright owner under" Title 17, § 1201(b)(1). *See, e.g., 321 Studios*, 307 F. Supp. 2d at 1095 ("It is evident to this Court, as it has been to previous courts, that CSS is a technological measure that both effectively controls access to DVDs and effectively protects the right of a copyright holder."); *Reimerdes,* 111 F. Supp. 2d at 317-18 (same).

### 2. RealDVD Circumvents Both The Access-Control And Copy-Control Technological Measures Of CSS

"Circumvention" under both the access-control and copy-control provisions is defined to include "avoid[ing], bypass[ing], remov[ing], deactivat[ing]," or otherwise "impair[ing]" the technological measure that provides the control.

---

circumventing "a technological measure that effectively controls access to a work protected under" Title 17. § 1201(a)(1).

§§ 1201(a)(3)(A), 1201(b)(2)(A).  RealDVD circumvents both access-control and copy-control measures.

### a.    RealDVD Circumvents CSS's Access Controls

RealDVD circumvents several of CSS's access controls.  First, RealDVD circumvents CSS's access-control mechanism that requires the player to authenticate itself to the disc drive in order to "unlock," and therefore access, the content that is on the DVD. Kelly Decl. ¶ 34a. RealDVD is authorized to use this authentication code to unlock the disc drive in order to access, decrypt and play the content.  It has not been authorized to *copy* it.  By utilizing the authentication code to unlock the disc drive in order to copy the content, RealDVD avoids and bypasses this control on access.  *Id.*; Bell Decl. ¶ 18 .

Second, RealDVD circumvents this same authentication process when it proceeds to play the content that RealDVD has previously copied to a hard drive. Of course, at that point, RealDVD has removed the DVD drive's ability to protect the DVD with an authentication sequence.  Hence, during playback from the hard drive, RealDVD avoids this access control of CSS altogether.  Kelly Decl. ¶ 33. In other words, RealDVD strips out the authentication layer of the CSS protection scheme entirely.  Nothing authorizes RealDVD to create copies of Plaintiffs' movies without the protection of the CSS authentication measures.

Third, RealDVD circumvents CSS's access-control mechanism for the keys that are needed to decrypt the DVD content during playback.  As discussed above, the keys are contained in the protected "lead-in" area of the DVD.  An authorized player may obtain those keys only if it satisfies the authentication measures, which ensures that the player is obtaining the keys for playback from a physical DVD. *See 321 Studios*, 307 F. Supp. 2d at 1096 ("Licensed DVD players have been issued a key to decrypt CSS, and in exchange must adhere to strict prohibitions on copying of the decrypted DVD").  RealDVD bypasses, avoids and impairs these technological measures.  RealDVD copies the keys – along with the encrypted

NOTICE & APPL. OF PLAINTIFFS FOR
TRO AND ORDER TO SHOW CAUSE

1    content – to the hard drive and strips away the protections afforded by the

2    authentication measures of CSS. RealDVD later utilizes the keys it has copied to

3    decrypt and play back, without any authorization, the content from the hard drive,

4    not from the physical DVD. Kelly Decl. ¶ 29.

5    **b.    RealDVD Circumvents CSS's Copy Controls**

6    RealDVD also circumvents CSS's technological measures for controlling

7    copying. This is undeniable, inasmuch as CSS is designed to prevent copying and

8    RealDVD's purpose is to copy DVDs. RealDVD accomplishes this in at least two

9    ways. First, as noted, RealDVD circumvents CSS by authenticating itself to the

10    disc drive and thereby "unlocking" and accessing the content that is on the DVD.

11    Because one cannot copy a DVD without first unlocking the drive, this access-

12    control mechanism also serves as a copy-control mechanism, which RealDVD

13    avoids and bypasses without authorization. *See 321 Studios*, 307 F. Supp. 2d at

14    1097 ("While 321 is technically correct that CSS controls access to encrypted

15    DVDs, the purpose of this access control is to control copying of those DVDs, since

16    encrypted DVDs cannot be copied unless they are accessed."). Second, RealDVD

17    circumvents CSS by making unauthorized copies to the hard drive of the movie on

18    the DVD and the CSS decryption keys from the protected "lead-in" area. It is

19    critical for RealDVD to copy the keys as well as the movie, because without the

20    keys, RealDVD cannot make a *playable* copy of the motion picture content copied

21    from the DVD. Kelly Decl. ¶ 29. *See 321 Studios*, 307 F. Supp. 2d at 1097 ("321

22    claims that CSS does not prevent copying, since it does[ not prevent copying the

23    encrypted data on the DVD. However, as 321 admits[,] 'that copying is not

24    particularly useful,' as any copy made without circumventing CSS could not be

25    accessed or viewed."). Under the DMCA, the keys can and do serve as both

26    access- and copy-control measures.

27

28

NOTICE & APPL. OF PLAINTIFFS FOR
TRO AND ORDER TO SHOW CAUSE

**RealDVD Does Not Have To "Break" CSS Encryption In Order To Be A Circumvention Product**

In public statements, Real has expressed its view that RealDVD does not circumvent CSS access- and copy-controls because "we don't *break* any encryption on the DVD[.]" Pomerantz Decl. Ex. K (emphasis added). That is just wrong. The definition of "circumvention" is not limited to "breaking" or otherwise disassembling an access- or copy-control measure. "Circumvention" includes "avoid[ing]," "bypass[ing]" or "impair[ing]" such a measure, any of which may be accomplished while leaving the measure physically intact. *See, e.g.*, *Microsoft Corp. v. EEE Business Inc.*, 555 F. Supp. 2d 1051, 1059 (N.D. Cal. 2008) (by distributing a key to unlock software "*without authorization*, [defendant] effectively circumvented Microsoft's technological measure to control access to a copyrighted work in violation of the DMCA") (emphasis added); *321 Studios*, 307 F. Supp. 2d at 1098 (same). Although Real has authorization under the CSS license to use the decryption keys and licensed technology to *play* content on DVDs, Real does not have the authority to use that technology to make a permanent, playable *copy* of DVD content. By using authorized technology for an unauthorized purpose, Real "avoid[s]," "bypass[es]" and "impair[s]" those very measures. In short, RealDVD circumvents CSS's access- and copy-control protections.

### 3. RealDVD Circumvents CSS's Access Control Measures "Without The Authority Of The Copyright Owner"

The statutory definition of "circumvention" for Section 1201(a)(2) (though not for Section 1201(b)(1)) provides that the circumventing conduct must be effected "without the authority of the copyright owner." § 1201(a)(3)(A).[6] "The copyright owners" in this case are the Plaintiffs. Real can point to no evidence – because there is none – showing that any Plaintiff has authorized Real or anyone

---

[6] The definition of "circumvention" in Section 1201(b) does not include any requirement that the conduct be "without the authority of the copyright owner." *See* § 1201(b)(2)(A). In all events, Real does not have Plaintiffs' authorization to circumvent CSS's copy-control measures.

NOTICE & APPL. OF PLAINTIFFS FOR
TRO AND ORDER TO SHOW CAUSE

1    else to utilize RealDVD to circumvent CSS and to make permanent, playable copies

2    of content on computer hard drives or to gain access to these unauthorized copies.

3    Cases like *Corley* and *321 Studios* establish that the contrary is true – plaintiffs

4    have never authorized anyone to circumvent CSS in this manner.

5        Real's public statements make it clear that it intends to rely on a state trial

6    court decision, *DVD Copy Control Association, Inc. v. Kaleidescape, Inc.*, for the

7    proposition that there is authorization from the copyright owners. There, the DVD

8    CCA sued Kaleidescape, a CSS licensee that made a high-end product (purchase

9    price starting at $10,000) that copied DVD content. The DVD CCA asserted

10   breach of contract, claiming that Kaleidescape breached restrictions on the use of

11   CSS contained in the license agreement's General Specifications. The trial court

12   ruled for Kaleidescape on that claim. Pomerantz Decl. Ex. L (Tr. at 875:17-24).

13   Real's CEO, Rob Glaser, has admitted that his company used Kaleidescape's

14   example – obtaining a CSS license and using the technology obtained thereby to

15   build a product that circumvents CSS – as a "sort of blueprint" for Real's

16   development of RealDVD. *Id.* ¶ 13; *see also id.* Ex. C at 2 (Real's counsel citing

17   *Kaleidescape* as justification for RealDVD).

18       *Kaleidescape*, which is on appeal and has no precedential or preclusive

19   effect, is irrelevant to the DMCA claim here.[7] The trial judge made it clear he was

20   not "tiptoeing into" any question of federal law. *Id.* Ex. L (Tr. at 886:1-7) ("It's

21   unnecessary to the court's determination"). The state law principles that the trial

22   _____

23   [7] Plaintiffs, who are third party beneficiaries under the DVD CCA License, have
     asserted a breach of contract claim in their complaint against Real. Plaintiffs fully
     expect that Real will attempt to assert in defense of that claim that Plaintiffs should
24   be bound by *Kaleidescape*'s contract ruling by virtue of their membership in DVD
     CCA. Even as to the contract claim, however, the *Kaleidescape* trial court ruling
25   can have no preclusive effect against Plaintiffs. Plaintiffs were not parties to that
     case. Even as to the parties to that case, the decision is not final; it is on appeal.
26   Under California law, a judgment is not final for purposes of collateral estoppel
     while on appeal. *See Abelson v. National Union Fire Ins. Co.* 28 Cal. App. 4th 776,
27   787 (1994). That California rule determines the application of collateral estoppel in
     federal court. *See Engquist v. Oregon Dep't of Agriculture*, 478 F.3d 985, 1007
28   (9th Cir. 2007). This motion, of course, is based on Plaintiffs' DMCA claim.

NOTICE & APPL. OF PLAINTIFFS FOR
                                                     TRO AND ORDER TO SHOW CAUSE

judge *did* rely on are fundamentally inconsistent with the federal law standards that apply here. Specifically, the trial judge's decision turned on whether the DVD CCA License *expressly prohibited* the defendant's conduct. Relying on state rules of contract interpretation, including that uncertainty is to be construed against the drafter of a contract, the trial judge held that prohibitions in the General Specifications asserted by the DVD CCA as the basis for its breach claim were not clearly "part of the contract signed by the parties." *Id.* (Tr. at 875:17-19). Under the DMCA, by contrast, the proper inquiry is whether a copyright owner affirmatively *authorized* the circumvention. Thus, even if Plaintiffs had issued the DVD CCA License or it were otherwise binding on them on the question of authorization (which it is not), federal law would not permit Real's conduct merely because it is not expressly prohibited. Under federal law, rights holders must *affirmatively authorize* rights or they are presumed to retain them.

The Ninth Circuit's decision in *S.O.S. Inc. v. Payday, Inc.*, 886 F.2d 1081 (9th Cir. 1989), exemplifies that rule. There, the district court held that because the defendant had a license to use a software program, it could not have infringed the plaintiff's copyright by copying and modifying the program. Using reasoning similar to that applied in *Kaleidescape*, the district court held that "California law required that the contract be construed against" plaintiff S.O.S as the drafter, thus "placing the burden" on it "explicitly to restrict" defendant Payday "from making modifications," and that "absent" a "restriction in the contract," the defendant "acquired the unrestricted right to adopt and utilize the program." *Id.* at 1087.

The Ninth Circuit reversed, clearly enunciating the difference between the application of state and federal law in the context of a federal law claim such as the DMCA claim asserted in *this* case:

> [T]he license must be construed in accordance with the purposes underlying federal copyright law. ... We rely on state law to provide the canons of contractual construction, but only to the extent such rules do not interfere with federal copyright law or policy. ... The district court applied the California rule that the contract should be interpreted

against the drafter ... thereby deeming S.O.S. to have granted to Payday any right which it did not expressly retain. *This result is contrary to federal copyright policy: copyright licenses are assumed to prohibit any use not authorized.*

*Id.* at 1088 (emphasis added). *Accord LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150, 1156-57 (9th Cir. 2006) (following *S.O.S.*). The rule is the same under the federal patent laws: "Any right not specifically granted by the licensor remains with the licensor, and the rights granted in the license cannot expand beyond the boundaries delineated in the agreement." *Cook Inc. v. Boston Scientific Corp.*, 208 F. Supp. 2d 874, 879 (N.D. Ill. 2002). *Accord Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1484-85 (Fed. Cir. 1998) (same).

Real cannot point to *anything* in the DVD CCA License that affirmatively authorizes the use of RealDVD to make and access permanent copies of copyrighted works on computer hard drives. Indeed, the entire thrust of the agreement is exactly to the contrary. The first recital to the license, for example, provides that CSS was "developed" to "provide reasonable security for content on DVD Discs and thereby, *together with the terms and conditions of this Agreement,* to provide protection for *such copyrighted content against unauthorized consumer copying.*" Pomerantz Decl. Ex. F at 1 (Recital A) (emphasis added). The license expressly notes the "lasting effect" and "harm" of "widespread unauthorized copying of copyrighted content" in granting motion picture companies who take a CSS license to encrypt their content third-party beneficiary rights to enforce the agreement and seek equitable relief under its provisions. *Id.* at 22 (§ 9.5). Nothing in the license grant provides any authorization for RealDVD's decryption of CSS for the purpose of making playable copies. Nor could the CSS license have done so, because the Plaintiffs, as copyright owners, never gave the DVD CCA the authority to grant such a right.

As a matter of federal law and by virtue of what the CSS license *does* say, Real cannot plausibly claim to have affirmative authorization to circumvent CSS to

1  make permanent, playable copies of content on computer hard drives or to gain

2  access to these unauthorized copies.

### 4. RealDVD's Design, Marketing And Use Violate Each Of The Anti-Trafficking Provisions Of Sections 1201(a)(2) and 1201(b)(1)

5  Real's trafficking in RealDVD violates all three sub-clauses of Section

6  1201(a)(2) and Section 1201(b)(1)'s restrictions:  (A) RealDVD is primarily

7  designed or produced for the purpose of circumventing CSS's access- and copy-

8  control protections; (B) RealDVD has no commercially significant purpose or use

9  other than to circumvent those protections; and (C) Real explicitly markets CSS for

10  use in circumventing CSS.  Accordingly, Real is in violation of both Sections

11  1201(a)(2) and 1201(b)(1).

### 5. Real Has No Defense To Its Violation Of The DMCA

13  Real has no valid defense to its DMCA violation.  The fact that RealDVD

14  may perform functions other than circumventing CSS – *e.g.*, displaying information

15  about the DVD and playing DVDs in the drive – is legally irrelevant.  The DMCA

16  is clear on its face that liability attaches to any "component" or "part" of a product

17  that circumvents access- or copy-control technological measures, even if other parts

18  of the product are not used to circumvent.  §§ 1201(a)(2), 1202(b)(1).  *See 321*

19  *Studios*, 307 F. Supp. 2d at 1097 (where "part of 321's software is solely for the

20  purpose of circumventing CSS[,] this portion of the software ... violates" the

21  DMCA).  This rule is well known to Real, which relied on it to obtain its own TRO

22  (and later preliminary injunction) against Streambox.  *See RealNetworks*, 2000 WL

23  127311 at *7 (DMCA liability where "at least a part of the Streambox VCR ...

24  circumvents the Copy Switch, enabling a user to make a copy of a file that the

25  copyright owner has sought to protect").

26  The law also forecloses Real from attempting to rely on assertions about the

27  legality of the downstream uses of RealDVD by particular users to avoid Real's

28  own liability for trafficking in a circumvention product.  *See, e.g., 321 Studios*, 307

F. Supp. 2d at 1097-98 ("However, the downstream uses of the software by the customers of 321, whether legal or illegal, are not relevant to determining whether 321 itself is violating the statute"); *Corley*, 273 F.3d at 443 (same); *United States v. Elcom Ltd.*, 203 F. Supp. 2d. 1111, 1120 (N.D. Cal. 2002) (same); *Macrovision*, 2006 WL 1063284 at *2 (same).

For all of the foregoing reasons, there is an overwhelming likelihood that Real is liable under the DMCA.

### C.  Plaintiffs Will Suffer Irreparable Injury Absent An Injunction

Because Plaintiffs are likely to succeed on their DMCA claim, irreparable injury is presumed. *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 532-33 (6th Cir. 2004); *Reimerdes*, 82 F. Supp. 2d at 215 (same).

Even without a presumption, it is clear that RealDVD threatens to cause massive, ongoing and irreparable harm to Plaintiffs.  RealDVD threatens to harm Plaintiffs in already established businesses (such as DVD sales and rentals); in newer distribution channels that are developing but not yet fully mature; and in developing products and services that have not yet come to market.  *In all these categories*, RealDVD threatens significant harm, and the quantum of that harm will be extraordinarily difficult to assess after the fact, rendering damages inadequate. *See* Declaration of Michael Dunn ("Dunn Decl.") ¶¶ 21-26 and *passim*.

RealDVD threatens another type of harm, as well.  Until this morning, consumers could not purchase software (i) from a well-known, publicly traded company, (ii) that allowed them to "rip" DVDs onto their hard drives, and (iii) that the company assured them was entirely "legal."  The very presence in the market of such a branded product – touted in such a way – threatens a significant and unquantifiable injury.  *Id.* ¶¶ 27-28 and *passim*.  For if – as submitted in the preceding sections – Real's "100% legit" mantra is incorrect, the shift in consumers' attitudes and behavior caused by Real's offering of a product branded as "legal" may be the most profound (and irremediable) injury of all.

NOTICE & APPL. OF PLAINTIFFS FOR
TRO AND ORDER TO SHOW CAUSE

### 1. RealDVD Will Irreparably Harm Plaintiffs' DVD Sales And Rental Market

Irreparable harm to the Plaintiffs is addressed by Michael Dunn, President of Twentieth Century Fox Home Entertainment LLC, in his declaration submitted herewith. Plaintiffs respectfully refer the Court to that declaration in its entirety. Salient aspects are summarized below.

Some 175 million DVDs were rented in the U.S. last month, at an average cost of approximately $3.25. Dunn Decl. ¶ 10. Some 50 million newly-released DVD movies were sold during the same period at an average price of approximately $18.50 (for non-Blu-ray discs). *Id.* Beginning today, RealDVD threatens to convert a portion of those 175 million $3.25 rentals into $3.25 *purchases*, because consumers can make permanent copies onto their computers.

The incentive for the consumer is obvious, and all but overwhelming. "Why," he or she may ask, "should I pay $18.50 to purchase a DVD when I can rent it for $3.25 and make a permanent copy?" "Why even rent it for $3.25, if I can just borrow it from a friend and make a copy?" *Or,* "Now that I've spent $29.99 on this RealDVD program, why don't I copy my friend's whole DVD collection?"

The damage to Plaintiffs as a result of the dissemination of RealDVD, though significant, also will be extremely difficult to measure. Dunn Decl. ¶¶ 25-26. Some significant number of sales (and attendant income) will be lost.[8] Some significant number of rentals (and attendant income) will be lost.[9] *Id.* But movies are not widgets, and it will be difficult to tell what portion of a decline in movie sales and rentals is the result of copying by RealDVD users, the economy, consumer preference, or numerous other factors. *Id.* Neither will Real be able to

---

[8] In the aggregate, Plaintiffs sold approximately fifty-million DVDs just last month, Dunn Decl. ¶ 4, and received total revenues of approximately $12.5 billion from such sales last year, *id.* ¶ 11.

[9] In the aggregate, Plaintiffs received approximately $2 billion in 2007 from the sale of DVDs to rental outlets and from rental sharing agreements. Dunn Decl. ¶ 12.

NOTICE & APPL. OF PLAINTIFFS FOR
TRO AND ORDER TO SHOW CAUSE

supply the answer; it will not know, for example, how many of the movies copied to its customers' computers are owned, or borrowed, or rented; there is no indication Real will know how many copies have been made at all using RealDVD. Such are the uncertainties that led the *Reimerdes* court to note – correctly – that damages, though inevitable, "probably are incalculable." *Reimerdes*, 82 F. Supp. 2d at 225-26.

## 2. RealDVD Will Irreparably Harm The Studios' Less Mature (And Developing) Markets

Federal courts, time and again, have held that a newcomer who releases an infringing product into an immature market irreparably harms the holder of intellectual property who is attempting to develop that market. For example, in *Tivo, Inc. v. Echostar Communications Corp.*, 446 F. Supp. 2d 664 (E.D. Tex. 2006), *rev'd on other grounds*, 516 F.3d 1290 (Fed. Cir. 2008), the defendant sold an infringing DVR machine in the same, developing market as the patent holder. The court explained: "Loss of market share in this nascent market is a key consideration in finding that Plaintiff suffers irreparable harm - Plaintiff is losing market share at a critical time in the market's development, market share that it will not have the same opportunity to capture once the market matures." *Id.* at 669-70.[10] This market harm is particularly acute where the targeted consumers are not yet attached to a brand and/or the consumers are unlikely to easily switch to a competitor's product once investing in a first purchase. *See, e.g., Tivo*, 446 F. Supp. 2d at 669-70; *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 2007 WL 5011980, at * 6-7 (N.D. Ga. Feb. 23, 2007).

---

[10] *See also Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 518 F. Supp. 2d 1197, 1215 (C.D. Cal. 2007); *MercExchange, L.L.C. v. eBay, Inc.*, 500 F. Supp. 2d 556, 578 (E.D. Va. 2007); *Warrior Sports, Inc. v. STX, LLC*, 2008 WL 783768 at * 12 (E.D. Mich. Mar. 19, 2008).

NOTICE & APPL. OF PLAINTIFFS FOR
TRO AND ORDER TO SHOW CAUSE

The threat that RealDVD poses to new and developing markets for Plaintiffs' works in digital format is palpable. Plaintiffs are actively developing new ways to get digital content into the hands of consumers, including:

- *Internet Download Services* – All Plaintiffs now offer content through one or more online download services such as iTunes, Amazon, MovieLink and others. Dunn Decl. ¶ 13. Consumers may opt to "rent" such downloaded movies for a limited period of time at a low price, or "purchase" them at a higher price. *Id.* (The typical price of a new full-length movie purchased on iTunes, for example, is $14.99 and the "rental" price is $3.99.) *Id.* Revenues to the Plaintiffs from internet downloads amounted to approximately $200 million in 2007, but they are projected to grow to approximately $1 billion over the next five years. *See id.* ¶ 14.

- *Video-on-Demand* – All Plaintiffs make content available through "video-on-demand" and "pay-per-view" services offered by cable-TV and satellite operators, among others. *Id.* ¶ 15. The average price of watching a video-on-demand movie is $4.00. *Id.* Revenues to the Plaintiffs from such services amounted to approximately $600 million in 2007, and are projected to grow to approximately $1 billion by 2012. *See id.* ¶ 16.

- *Digital Copy* – In just the past year, some studios have begun to offer a new product called "Digital Copy." "Digital Copy" versions of DVD movies are sold – at a higher cost than the regular version – with an extra disc containing additional features. One of the features of the second disc is the ability to place it in a computer's DVD drive and copy the movie to a computer's hard drive. Digital Copy is particularly relevant because it allows consumers to purchase from the Studios that which RealDVD is trying to sell for its own benefit. *Id.* ¶ 18.

These and other markets for digital downloads are young and developing, *see id.* ¶¶ 13-20 , but they are hardly speculative. On the contrary, products that already have come online are providing the Studios with increasingly significant revenues. In 2007, the Internet Download Services and Video-on-Demand markets

NOTICE & APPL. OF PLAINTIFFS FOR
TRO AND ORDER TO SHOW CAUSE

1    alone provided Plaintiffs with approximately $800 million in revenues, *id.* ¶¶ 14,

2    16, and they are projected to grow to over $2 billion over five years.[11] *See id.*

3        For the reasons described in the accompanying Dunn Declaration – many of

4    which are self-evident – the entry of RealDVD into nascent markets for digital

5    downloads threatens significant harm to Plaintiffs. The common thread among

6    many new digital products is that they provide consumers with an opportunity – for

7    a fee – to obtain digital copies of movies and TV shows on their computers' hard

8    drives. RealDVD does the same thing. It does so at a lower cost to the consumer

9    by cutting Plaintiffs and their legitimate partners out of the equation. And, because

10    Real has a large and established customer base for its other products, there is a

11    higher likelihood that it will form bonds with those customers in its new RealDVD

12    space, before Plaintiffs have had a chance to develop loyal customers of their own

13    new businesses.

14        This threat of Real shaping this market to Plaintiffs' disadvantage is

15    enhanced by the fact that Real is a known and established brand that is repeatedly

16    assuring consumers that RealDVD is "100% legit" and entirely legal. Plaintiffs,

17    acting through the MPAA, have spent millions of dollars to discourage unlawful

18    activities such as pirating and unauthorized copying of movies. *Id.* ¶ 29. Real's

19    (false) prophesies of legality have the likely potential of altering consumer attitudes

20    towards DVD-copying and, accordingly, consumer behavior. *Id.*

21        These facts, combined with Real's extensive publicity marketing efforts,

22    demonstrate that the threat of Real rushing in to shape a developing market to

23    Plaintiffs' disadvantage is undeniable. Absent an injunction, the threat of

24    irreparable harm to Plaintiffs is overwhelming.

25

26    _____

[11] The Digital Copy, Burn-to-DVD, Managed Copy and Flash Media Kiosk markets

27    are too nascent to allow for meaningful estimates of current or projected revenues, but the Studios have invested resources in considering and/or developing these

28    markets. *See* Dunn Decl. ¶¶ 17-20.

NOTICE & APPL. OF PLAINTIFFS FOR
TRO AND ORDER TO SHOW CAUSE

1    **IV.    CONCLUSION**

2           Plaintiffs respectfully requests that the Court issue a Temporary Restraining

3    Order and Order to Show Cause why a Preliminary Injunction should not issue, in

4    the form submitted herewith.

5    DATED: September 30, 2008          MUNGER, TOLLES & OLSON LLP

6                                       MITCHELL SILBERBERG & KNUPP
7                                       LLP

8                                       GREGORY P. GOECKNER
                                        DANIEL E. ROBBINS
9

10                                      By: _____
                                             GLENN D. POMERANTZ
11
                                        Attorneys for Plaintiffs
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28